UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY LYNN GRUSNICK,

      Petitioner,

                           CASE NO. 4:12-CV-11550
v.                         JUDGE MARK A. GOLDSMITH
                           MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

      Respondent.
                              /

## REPORT AND RECOMMENDATION

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.    REPORT:

A.    *Procedural History*

    1.    Petitioner Kimberly Lynn Grusnick is a state prisoner, currently confined at the Huron Valley Correctional Facility–Women's Complex in Ypsilanti, Michigan.

    2.    On December 15, 2009, petitioner was convicted of first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); and five counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, following a jury trial in the Oakland County Circuit Court. On January 26, 2010, she was sentenced to concurrent terms of 126 months to 30 years imprisonment for first-degree home invasion and five sentences of 126 months to 40 years' imprisonment for each assault with intent to rob while armed conviction.

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claim:

> MS. GRUSNICK WAS DENIED HER STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL BY IMPARTIAL JURY UNDER THE SIXTH AMENDMENT, AND DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND CONST. 1963, ART. 1, § 17, BY IMPROPER, BURDEN-SHIFTING PROSECUTORIAL ARGUMENT, WHICH ALSO INDIRECTLY REFERENCED PETITIONER'S EXERCISE OF HER FIFTH AMENDMENT RIGHT TO REMAIN SILENT.

The court of appeals found no merit to petitioner's claim, and affirmed her conviction and sentence. *See People v. Grusnick*, No. 297671, 2011 WL 2585980 (Mich. Ct. App. June 30, 2011) (per curiam).

    4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Grusnick*, 490 Mich. 913, 805 N.W.2d 198 (2011).

    5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on April 5, 2012. As grounds for the writ of habeas corpus, she raises one claim: she was denied her right to a fair trial by improper, burden-shifting prosecutorial argument, which also indirectly referenced petitioner's exercise of her Fifth Amendment right to remain silent.

    6.    Respondent filed her answer on October 16, 2012. She contends that all of petitioner's claim is without merit.

    7.    Petitioner filed a reply to respondent's answer on November 26, 2012.

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from an August 7, 2009, home invasion and robbery in White Lake, Michigan. The evidence adduced at trial is accurately summarized in respondent's answer, as adapted from the prosecutor's brief in the Michigan Court of Appeals:

> On August 7, 2009, Joshua Knope resided at 344 Laurent Street in Cedarbrook Estates in White Lake, Michigan. (12/11/09 Trial Tr. at 42-43.) A friend

of his, Luke Dickerson, also lived there. (12/11/09 Trial Tr. at 43.) Other friends: Monica Pepin, Rochelle Novak, and Sabrina Desjardins, were visiting at the time. (12/11/09 Trial Tr. at 84-85.)

Knope was in his bedroom, with the window open, when he heard people approaching the trailer. (12/11/09 Trial Tr. at 48.) He poked his head out the window and saw an Asian male [later identified as Chhoung Mak] and a Caucasian female who he identified as Petitioner. (12/11/09 Trial Tr. at 56.) He said that the Asian male went by the nickname of "Ricko" and wore glasses and a baseball hat. (12/11/09 Trial Tr. at 56-57.) Petitioner told Knope that they were Dickerson's friends and that Dickerson told them to come by. Knope told them that Dickerson was not there but he could call him for them. (12/11/09 Trial Tr. at 55, 58.)

Knope went to the front door, but before he could open it, Petitioner and Mak walked into his trailer. (12/11/09 Trial Tr. at 59.) Knope had not given them permission to enter. (12/11/09 Trial Tr. at 59.) Both Petitioner and Mak again asked for Dickerson. Knope repeated he would call Dickerson for them. Mak asked to use the bathroom. (12/11/09 Trial Tr. at 59.) While Mak went to use the bathroom, Petitioner left the trailer, indicating she would be right back. (12/11/09 Trial Tr. at 61.)

Knope walked by the kitchen window and saw two African-American males and Petitioner standing at his front door. (12/11/09 Trial Tr. at 62.) Knope ran and woke his friend Chad Hipkins who was sleeping in the living room. He pulled Hipkins in the back and said that something was going on. (12/11/09 Trial Tr. at 64-65.) Knope said he was concerned since the night before Dickerson received a phone call indicating someone was going to rob them. (12/11/09 Trial Tr. at 64, 105.)

Knope and Hipkins left the trailer by way of the sliding glass door in Dickerson's room. (12/11/09 Trial Tr. at 65.) Knope said that three of his friends (Monica Pepin, Rochelle Novak, and Sabrina Desjardins) were in Dickerson's room as he and Hipkins left the trailer. (12/11/09 Trial Tr. at 65-66.)

When Knope and Hipkins were talking outside, Knope saw Mak walk half-way out the sliding glass door and point a gun in their direction—commanding them to get back in the home. (12/11/09 Trial Tr. at 66, 118.) Rochelle Novak started running into the woods. (12/11/09 Trial Tr. at 67.) When Mak saw her running he pointed the gun at her and said, "I'm going to murk this bitch[,]" which was taken to mean murder. (12/11/09 Trial Tr. at 67.) He heard someone take off running after Novak. Mak pointed the gun at Monica Pepin. (12/11/09 Trial Tr. at 68.)

Knope re-entered the trailer and saw the taller African-American male, who he identified at trial as Edward Andrews, a co-defendant, going through his freezer. (12/11/09 Trial Tr. at 69, 72, 87.) Knope asked Andrews what he was doing to which Andrews replied he was looking for money. (12/11/09 Trial Tr. at 73.) He said he was looking for "stack" which is slang in drug-dealing, for $1,000. (12/11/09 Trial Tr. at 91.) Knope then saw Mak with an X-box 360 which had been in Dickerson's room. (12/11/09 Trial Tr. at 90.) It belonged to Knope's friend Nate and no one had given Mak permission to take it. (12/11/09 Trial Tr. at 119.)

Knope walked out of the trailer while Mak pursued him; asking what his

name was and where he was going. Knope started running. (12/11/09 Trial Tr. at 73-74.) Knope ran to a friend's house and told them to call the police. (12/11/09 Trial Tr. at 74.) He said while running he saw the perpetrators in a car with the Petitioner driving. He had to jump out of the way or he would have been run down. (12/11/09 Trial Tr. at 75-77.)

Knope then ran back to the trailer and got into his car. Hipkins also jumped in and they pursued the car the perpetrators were in to a gas station. (12/11/09 Trial Tr. at 77.) Police officers had already pulled the subjects over and had them restrained at gun point. (12/11/09 Trial Tr. at 77.) Knope and Hipkins identified the perpetrators for the police officers. (12/11/09 Trial Tr. at 77.)

Chad Hipkins testified similarly to Joshua Knope that he was at the trailer on the date of the incident. (12/11/09 Trial Tr. at 129.) Hipkins confirmed he awoke when Knope tapped him; saying that he thought something was going on. (12/11/09 Trial Tr. at 130.) Hipkins saw a Caucasian female exiting the trailer [later identified as Petitioner]. (12/11/09 Trial Tr. at 152.) They went out in the back to talk about the situation. (12/11/09 Trial Tr. at 130.) Hipkins feared for his safety. (12/11/09 Trial Tr. at 160.) While they talked he heard someone say, "Get back in the house." He turned around and saw a gun pointed in his direction. He told the man with the gun that he wasn't going any further. (12/11/09 Trial Tr. at 133.) The man looked either Puerto Rican or Asian and wore a hat and glasses, (12/11/09 Trial Tr. at 134-135) and referred to himself as "Ricko" [identified by others as Chhoung Mak]. (12/11/09 Trial Tr. at 142.)

Ricko pointed the gun at Sabrina Desjardins who was in Dickerson's room and said he was going to shoot her if they didn't come in. (12/11/09 Trial Tr. at 136.) Hipkins testified that he had also seen Rochelle Novak run past him into the woods. (12/11/09 Trial Tr. at 137.) Before Hipkins went back inside the trailer, he emptied his pockets on the back patio. (12/11/09 Trial Tr. at 166.)

Once Hipkins got back into the trailer he saw a man with dread locks and tattoos [identified by Knope as co-defendant Andrews] rifling through the clothes in Dickerson's bedroom. (12/11/09 Trial Tr. at 137-138, 162.) The man said Dickerson owed him money. (12/11/09 Trial Tr. at 138.) He also saw that Petitioner re-entered the trailer. (12/11/09 Trial Tr. at 164.) Hipkins also saw Petitioner standing by Ricko with duct tape in her hands. (12/11/09 Trial Tr. at 140.) She pulled out a portion of the duct tape as if expecting to use it. (12/11/09 Trial Tr. at 157.) Ricko then took a backpack with an X-box 360 from the trailer, (12/11/09 Trial Tr. at 143), belonging to Nathan Bolt. (12/11/09 Trial Tr. at 142.) Hipkins also saw a shorter African-American male with a "fade" hairstyle outside the trailer at one point with Petitioner. (12/11/09 Trial Tr. at 145-146.) When Hipkins walked in the kitchen he also saw the taller male who had been in Dickerson's room searching the cabinet and the refrigerator. (12/11/09 Trial Tr. at 165-166.)

At one point the subjects left the trailer and Hipkins jumped into Knope's car. They followed the subjects until they saw police had stopped them at a gas station. (12/11/09 Trial Tr. at 141.) Hipkins recognized the white female and three males as the individuals who had been at their trailer shortly before. (12/11/09 Trial Tr. at

145.)

Rochelle Novak said that the evening before Dickerson received a phone call from someone they knew by the name of "Joey" stating that three black guys were walking around the trailer park looking for him. (12/11/09 Trial Tr. at 182, 213.) She said she was in Dickerson's bedroom the day of the robbery with Sabrina Desjardins when Monica Pepin came running back saying that there were some people she had never met before looking for Dickerson. (12/11/09 Trial Tr. at 183-184.) Novak went into the hallway where she saw a heavy-set white female and an Asian male wearing glasses, a hoody, and a hat. (12/11/09 Trial Tr. at 185.) Novak said Petitioner's appearance was consistent with this white female. (12/11/09 Trial Tr. at 186.) Pepin pulled Novak back into Dickerson's bedroom saying that she thought that those were the individuals they were warned about. (12/11/09 Trial Tr. at 187.)

Novak was scared and stepped outside on the patio by Dickerson's bedroom. (12/11/09 Trial Tr. at 187-188.) Knope and Hipkins soon joined her. (12/11/09 Trial Tr. at 190.) The Asian man came into the bedroom and while standing at the door, told her to get in the house before he "murk" her, which Novak said meant murder. (12/11/09 Trial Tr. at 189, 191, 193.) The white female [Petitioner] was in this bedroom at the time—holding duct tape. (12/11/09 Trial Tr. at 191, 223.) Novak also saw the two African-American males coming around to the back of the trailer. (12/11/09 Trial Tr. at 216.) She started running through the woods. (12/11/09 Trial Tr. at 193.) She was afraid she was going to be shot. (12/11/09 Trial Tr. at 199.) She went to a friend's home and called police. (12/11/09 Trial Tr. at 196-198.)

Sabrina Desjardins had been sleeping in Dickerson's bedroom (with the sliding glass door) and was awakened by a man asking to use the bathroom. She opened her eyes and saw an individual who she identified at trial by photograph as Chhoung Mak, the individual others called "Ricko" who had the last name of Mak. (12/14/09 Trial Tr. at 35.) Mak walked into the room and told the three people outside (Novak, Hipkins and Knope) to, "get in the house before you get murked." (12/14/09 Trial Tr. at 36.) Mak had a gun in his hand, (12/14/09 Trial Tr. at 37), which was initially pointed at Sabrina and Monica. (12/14/09 Trial Tr. at 37, 39.)

Desjardins said that Mak began rifling through the drawers and closet. An African-American man with dread locks and teardrop tattoos (who she identified at trial as the co-defendant Edward Andrews) entered the room and also rifled through Dickerson's things. (12/14/09 Trial Tr. at 44-45.) One of the two said Dickerson owed them money. (12/14/09 Trial Tr. at 45.) Desjardins also saw a white female (who she identified at trial as Petitioner) enter Dickerson's room holding duct tape. (12/14/09 Trial Tr. at 47-49.) Mak asked them to contact Dickerson so Desjardins called him and told him people were there asking for him. (12/14/09 Trial Tr. at 50.) Dickerson said he was working. (12/14/09 Trial Tr. at 50.) Desjardins confirmed Petitioner was present when Mak pointed the gun at various occupants of the trailer. (12/14/09 Trial Tr. at 57.)

After the individuals were finished going through the room, someone said that the police were on the way. Mak took the backpack containing an X-box from Dickerson's closet. (12/14/09 Trial Tr. at 52-53.) Desjardins said the backpack

5

belonged to someone else and told Mak that he wasn't taking it. (12/14/09 Trial Tr. at 53-54) Mak replied it was his backpack now. (12/14/09 Trial Tr. at 54.) When Desjardins tried to grab it, Ricko pushed her away and said he was going to shoot her. (12/14/09 Trial Tr. at 55-56.)

     Monica Pepin saw a white female who she identified as Petitioner and someone who referred to himself as "Ricko" out the window. (12/14/09 Trial Tr. at 90, 93, 94, 109.) Pepin told Knope she had never seen them before. (12/14/09 Trial Tr. at 90-91.) Knope looked out the window. (12/14/09 Trial Tr. at 91-92.) Petitioner said they were Dickerson's friends. (12/14/09 Trial Tr. at 94.) Petitioner opened the door and walked in. (12/14/09 Trial Tr. at 95.) Pepin told them that Dickerson was at work but that she would go in the back and check. (12/14/09 Trial Tr. at 96.) Ricko asked to use the restroom. (12/14/09 Trial Tr. at 97.) After Ricko came out of the bathroom, Pepin saw Andrews enter Dickerson's room. (12/14/09 Trial Tr. at 98.) Hipkins, Knope and Novak ran outside. (12/14/09 Trial Tr. at 99.)

     Ricko pulled out a gun, cocked it, and held it in the direction of Pepin and Desjardins. Ricko asked where Novak was going and said, "get down, you're being robbed." He asked for Dickerson who he claimed owed him money. (12/14/09 Trial Tr. at 100-101.) Petitioner walked in with a roll of duct tape in her right hand. Pepin believed that the defendant was going to tie them up with duct tape. (12/14/09 Trial Tr. at 102.) Ricko yelled at Knope and Hipkins to get back inside and held a gun to Pepin's head and said that if they didn't get back inside, he was going to shoot her. (12/14/09 Trial Tr. at 102.) Knope and Hipkins came back inside. (12/14/09 Trial Tr. at 103-104.) When Pepin went to call Dickerson, Ricko pointed the gun at her asking who she was calling. When she said she was calling Dickerson, he appeared to be satisfied. (12/14/09 Trial Tr. at 141.) Pepin felt threatened by the presence of each of the perpetrators. (12/14/09 Trial Tr. at 159.) Pepin saw the three perpetrators leave the trailer, and go to the other side of the street where there was a green Grand Prix parked. The Grand Prix was facing the exit to the trailer park. (12/14/09 Trial Tr. at 110-111.)

     Officer Rogowicz received a dispatch to be on the look-out for a green Pontiac Grand Prix with a specific license plate number connected to an armed robbery which had just occurred. (12/14/09 Trial Tr. at 14-17.) He saw a vehicle matching that description with a partial match on the license plate number drive by. (12/14/09 Trial Tr. at 18.) He followed the vehicle until it pulled into a gas station. Id. He stopped the vehicle and pulled each of the occupants out of the vehicle. (12/14/09 Trial Tr. at 19-20.) There were four people in the vehicle: a white female who was identified as Petitioner, was driving; two African-American males, one with the last name of Lewis and the co-defendant, Edward Andrews; and an Asian male, Chhoung Mak. (12/14/09 Trial Tr. at 20-24.) Joshua Knope and Chad Hipkins arrived on the scene. (12/14/09 Trial Tr. at 24.)

     Officer Barber also responded to the dispatch and followed the Pontiac Grand Prix to the Shell station. (12/14/09 Trial Tr. at 161-163.) The parties stipulated that Petitioner was the driver of the vehicle; the front-seat passenger was Mr. Lewis; and the two back passengers were Edward Andrews and Chhoung Mak. (12/14/09 Trial

6

> Tr. at 170.) There was a backpack in the trunk area which contained an X-box. (12/14/09 Trial Tr. at 168.) There was also an envelope in the backpack containing the social security card, driver's license, and birth certificate of Nathan Bolt (testified to be the backpack's owner). (12/14/09 Trial Tr. at 168.) Another officer discovered a roll of gray duct-tape in the vehicle. (12/14/09 Trial Tr. at 179.) And a loaded firearm was found in the glove box against the fuse panel. V (12/14/09 Trial Tr. at 172-174.)
>
> Nathan Bolt, a defense witness, knew Joshua Knope from the neighborhood, (12/14/09 Trial Tr. at 202-204), and had dated Sabrina Desjardins for a short time but the relationship ended badly. (12/14/09 Trial Tr. at 205, 218.) Bolt said he would occasionally stay in the back room of the trailer and had known Dickerson for about a year. (12/14/09 Trial Tr. at 206.) He said he would smoke marijuana at the trailer and would occasionally buy marijuana from Dickerson but that Dickerson would short him. (12/14/09 Trial Tr. at 207-208.) He also said there was heavy traffic into the home due to Dickerson's marijuana dealing. (12/14/09 Trial Tr. at 213.)
>
> Mr. Bolt identified his backpack which had been found in the back of the car driven by the defendant. (12/14/09 Trial Tr. at 208.) He said he stored it in Dickerson's closet and was angry when he found out his backpack had been taken. (12/14/09 Trial Tr. at 209.) Bolt did not know the co-defendant or Petitioner. (12/14/09 Trial Tr. at 212-213.)

Answer, at 9-18; *see also*, Def.-Appellant's Br. on Appeal, in *People v. Grusnick*, No. 297671 (Mich. Ct. App.), at 1-8.

C.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>       (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus,

"[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements

of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Analysis*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted.). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations." *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In reviewing whether a prosecutor has deprived a defendant of a fair trial, a court may not consider the prosecutor's conduct in isolation, but must consider the conduct in the context of the entire proceedings. *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974). Even on direct review, where AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 11.

Although a prosecutor's indirect comment on a defendant's failure to testify or produce evidence, such as a statement that the prosecutor's evidence is uncontradicted, may be

unconstitutional, not every such comment is impermissible. Rather, the constitutionality of the indirect reference depends on the circumstances of the case. *See e.g., Lockett v. Ohio*, 438 U.S. 586, 594-95 (1978). A prosecutor may comment on a defendant's failure to call witnesses or offer other evidence to support his factual theories so long as the prosecutor's comment does not implicate a defendant's right to testify. *See United States v. Bautista*, 23 F.3d 726, 733 (2d Cir. 1994); *United States v. Williams*, 990 F.2d 507, 510 (9th Cir. 1993); *United States v. Sensi*, 879 F.2d 888, 900 (D.C. Cir. 1989); *United States v. Dahdah,* 864 F.2d 55, 59 (7th Cir. 1988). In order to conclude that the prosecutor's remarks amounted to an impermissible comment on petitioner's failure to testify, the Court "must find one of two things: that the prosecutor's manifest intention was to comment upon the accused's failure to testify or that the remark was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981) (internal quotation omitted); *accord Byrd v. Collins*, 209 F.3d 486, 533-34 (6th Cir. 2000); *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988).

Petitioner claimed on direct appeal that the prosecutor committed misconduct, depriving her of her right to a fair trail by inappropriately referencing her right to remain silent. Petitioner's sole issue on habeas review is the following remark by the prosecutor:

> "And its not just that, she's the driver of the car. She's the person who first gains entry into the house. She's the one who leaves and comes back with the duct-tape. *No one has contradicted that*. Nobody."

Here, the prosecutor's comment was not manifestly intended to comment on petitioner's failure to testify, nor would it necessarily have been interpreted by the jury as such. The prosecutor did not in any way suggest that petitioner had any duty to testify or come forward with any evidence. Rather, the prosecutor noted, correctly, that this particular piece of testimony was uncontradicted.

11

Further, any ambiguity that the prosecutor's argument may have created for the jury on the matter of the burden of proof was cured by the trial court's instructions on the proper burden of proof. *See Scott v. Elo*, 302 F.3d 598, 603-04 (6th Cir. 2002); *Lugo v. Kuhlmann*, 68 F. Supp.2d 347, 369 (S.D.N.Y. 1999). Finally, any error in the prosecutor's isolated comment is harmless in light of the overwhelming evidence of petitioner's guilt, which included the multiple identification by the victims and her arrest shortly after in a car containing both the tools and the proceeds of the robbery. *See United States v. Harris*, 271 F.3d 650, 702-04 (7th Cir. 2011); *United States v. Veal*, 797 F. Supp. 527, 530-31 (M.D. La. 1992). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on her prosecutorial misconduct claim.

E.      *Recommendation Regarding Certificate of Appealability*

   1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never

12

issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2. *Analysis*

If the Court accepts my recommendation on the merits of petitioner's claim, the Court should

also conclude that petitioner is not entitled to a certificate of appealability. Petitioner bases her petition on one claim: that the prosecutor committed misconduct by inappropriately referencing her right to remain silent during closing arguments. Her sole claim is without merit. The prosecutor did not commit misconduct during closing arguments because the comment never referenced her right to remain silent. The comment simply referred to undisputed testimony that the defendant was the driver and also held duct tape, most likely to restrain the victims during the robbery. *See Grusnick*, 2011 WL 2585980, at *2. Therefore, the prosecutor's comments did not rise to the level of misconduct. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

F.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the

objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: July 22, 2013	s/ Paul J. Komives
	PAUL J. KOMIVES
	UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on July 22, 2013, electronically and/or by U.S. mail.

	s/Michael Williams
	Relief Case Manager for the
	Honorable R. Steven Whalen

15